IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WALTER DEAN ERNEST,

    Petitioner,

        v

DAVID L RUNNELS, Warden,

    Respondent.

_____/

No C 05-2843 VRW (PR)

ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

        Petitioner was convicted by an Alameda County superior court jury of rape and false imprisonment. After a subsequent court trial, he was found to have suffered two prior "strike" convictions, two prior serious felony convictions, and one prior prison term. On May 22, 2003, petitioner was sentenced to 31 years to life in state prison.

        On January 19, 2005, the California Court of Appeal affirmed the judgment of the trial court and, on April 13, 2005, the California Supreme Court denied review.

On July 13, 2005, petitioner filed the instant petition for a writ of habeas corpus under 28 USC § 2254. On December 21, 2005, the court found that petitioner's claims appeared cognizable under § 2254, when liberally construed, and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent instead moved to dismiss on the ground that three of petitioner's claims were unexhausted. After petitioner eventually agreed to dismiss the three claims as unexhausted, the court reinstated its prior order to show cause as to the remaining three claims. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

I

The California court of appeal summarized the factual background of the case as follows:

> The victim first met the defendant in June 1999. She was walking down the street toward a BART station after work, and defendant pulled over in his car and began to talk to her. It was daytime and the victim was alone. The victim testified that she gave defendant her phone and pager numbers because she thought he was cute. She also testified that it was not unusual for people to meet each other like that in that particular neighborhood.
>
> On January 7, 2000, the night defendant raped the victim, the victim was working at her job as a cashier at Walgreen's in Oakland. During her 4:00 p.m. to midnight shift, defendant paged her. She returned defendant's page. At first she did not remember who he was; then she remembered having met him on the street several months earlier.
>
> Defendant asked the victim if she wanted to hang out with him after she got off work. The victim said she did not. The conversation continued

2

and defendant told the victim he had learned she might be moving back to Arkansas, where her mother lived. The victim, who lived with her father and his girlfriend, neither of whom she liked because they were drug users, thought she might have to return to Arkansas because her father was being evicted from the apartment she shared with him. At the end of this conversation, defendant asked the victim again if she wanted to hang out. This time, she told him she would think about it and that he could call her back.

Defendant called later that evening and offered to give the victim a ride home from work. After defendant repeated his offer several times, the victim agreed to accept a ride. She testified that she told the defendant, "If you want to have sex with me, I don't get down like that." The victim explained that she often said this to men she met. In this case, "it was late and that's just how guys are." Defendant told the victim he did not want to have sex and that he wanted to see her before she moved.

Defendant came by the Walgreen's store at a little after midnight. When she was ready to leave, the victim got in defendant's car. While they were in the car, they discussed her move. Defendant offered to get her an apartment to share with him. This surprised the victim, who was not interested in moving in with defendant. Defendant also asked the victim if she wanted to go to the hot tubs. She told him no and asked him to drop her off at a nearby BART station. Defendant, however, passed the BART station and the freeway on-ramp and drove instead to the Berkeley Marina. The victim was nervous and asked defendant why he was doing this. He told her he wanted to talk for a while. He parked in a parking lot by a restaurant, which, because it is dark and secluded is, according to the victim, a popular "make out" spot.

Defendant and the victim spoke about her childhood in Arkansas. The victim told the defendant a story about a time when she was younger and wore a bikini at a swimming pool. The other girls did not like her and made their boyfriends get out of the pool.

Defendant then asked the victim if he could see her stomach. She said no but after defendant asked her several times, she acquiesced and pulled up her shirt a little bit. Defendant offered to show the

3

victim his stomach and she told him not to. He then pulled out his penis and the victim began to feel afraid. The victim asked defendant to stop and take her home. Defendant instead asked the victim to show him her legs. She refused and he persisted. She asked him to stop. When she tried to open the door to the car, she discovered it was locked. Defendant told her not to waste her time because the car had childproof locks. The victim was afraid, felt trapped, and wanted to get out of the car.

She began to cry. Defendant told her he wanted to see her legs, that he had a knife under the seat and would cut her neck if she did not do so. He said if she showed them to him he would take her home. Although the victim did not see a knife, she feared for her life and did not think she would be able to leave the car.

Defendant then raped the victim, threatening her with a knife if she did not comply. She asked him to stop and, in an attempt to get help, reached back and wrote, "Help me" in the moisture on the fogged over back window. Defendant put on a condom, which broke before he penetrated the victim. A few minutes after defendant penetrated the victim's vagina with his penis, he withdrew and ejaculated on his shirt. Some of the ejaculate got on the victim and she wiped it off with napkins she found on the floor of the car. Defendant threw the condom and napkins out the window.

Defendant drove the victim home. He asked her not to be angry with him and apologized for what he had done. He kissed her against her will before he left. The victim tried to behave as though everything was okay because she was afraid defendant might hurt her.

The victim called 911 after she entered her apartment. She met the police outside because her father was home and she did not want him to know what had happened. The victim returned to the scene with the police and the used condom and tissues were located and taken into evidence. Afterward, the police took the victim to the hospital for a sexual assault exam. While waiting to be examined, the victim gave the police a statement. In this statement, the victim said she had known defendant for one or two months. She testified at trial that this was mistaken; she first met defendant in June 1999, but she was tired when she made the statement.

4

The medical director of the sexual assault response team reviewed the victim's medical records. She testified that the victim had five fresh abrasions of less than one centimeter in length on her posterior fourchette. She also testified that this was a "significant" number and that these injuries were consistent with forced, non-consensual intercourse. In her experience, the medical director testified, this type of injury did not follow consensual intercourse.

The victim returned home at around 9:00 a.m. and defendant called her shortly afterwards. He asked her if she had told her father. She said no, and then told defendant she had to go.

Several days after she was raped, the victim agreed to make two "pretext" phone calls to defendant. Before the call, a police officer told her to try to engage defendant in a normal conversation and then ask him why he did what he had done to her. The victim testified she did not want to talk to defendant, agreed to make the calls to help the police and that she was nervous when she made the calls. Tapes of the phone calls were played to the jury and transcripts were admitted into evidence.

During the first conversation, defendant asked the victim if she was still upset. She replied, "Yeah. Why wouldn't I be upset?" Defendant said, "Oh, yeah, I'm feeling bad about it myself." The victim replied that the defendant "should feel bad. I mean, you told me you didn't want to do that and you wasn't going to do that to me." Defendant did not respond to this comment and, instead, changed the subject to whether the victim was able to find an apartment. Defendant asked if he could speak to the victim the next day and she agreed to do so.

The victim made another pretext phone call several days later. Defendant again raised the subject of helping the victim find an apartment. The victim told defendant that she did not know if she wanted this because she was afraid of him. Defendant asked her why she was afraid of him and the victim replied, "Because you might go off on me like you did last time when I was with you." Defendant said "Of course not." However, when the victim asked him why, when he took her home, he "mainly start screaming at me and yelling at me," defendant changed the subject and asked the victim if she had looked in the paper for an apartment. Although the

5

> victim tried to discuss the rape again, defendant simply changed the subject.
>
> DNA testing revealed the defendant's DNA type was on the condom recovered by the police at the scene. Testing also established that defendant's DNA, as well as the DNA of two other men, was on the underwear the victim had worn the night she was raped. A DNA expert testified that sperm is durable and can exist on underwear even after it is washed and dried. The expert testified that there was no way to tell how long any of the sperm had been on the underwear. The victim testified that she had owned the underwear for a year and a half to two years at the time of the incident.
>
> Defendant was arrested on January 14, 2000. The police asked him for the keys to his car to make it easier to tow his car pending a search warrant. Defendant refused to give the police his keys and told them it was not his car. During a later search of the car, the police found documents that showed the car was leased to defendant, and registered and insured in his name.
>
> After a jury trial, defendant was convicted of rape, false imprisonment, found to have suffered two prior "strike" convictions, two prior serious felony convictions, and one prior prison term. He was sentenced to 31 years to life in prison.

People v Ernest, No A102979, 2005 Cal App Unpub LEXIS 454, at ** 2-10 (Cal Ct App Jan 19, 2005).

II

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

6

determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v Taylor, 529 US 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id at 409.

The only definitive source of clearly established federal law under 28 USC § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id at 412; Clark v Murphy, 331 F3d 1062, 1069 (9th Cir 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's

**7**

holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

### III

Petitioner seeks habeas relief under 28 USC § 2254 based on three claims: (1) he was denied due process because the trial court excluded evidence that the victim had been arrested for agreeing to an act of prostitution with an undercover officer three years before the rape; (2) he was denied due process because the trial court excluded evidence that the victim had been fired from her job at a drug store for stealing; and (3) the trial court's findings on his prior convictions require reversal because petitioner was absent from the proceedings and was entitled to a jury trial on those issues.

#### A

Petitioner claims the victim's prostitution arrest was relevant as a crime of moral turpitude to impeach her credibility and also because it supported his theory that the victim was acting as a prostitute on the night of the rape. Petitioner moved to introduce the evidence prior to trial, but the trial court excluded it under California Evid Code § 352, finding it was more prejudicial than probative.

The California Court of Appeal found no abuse of discretion in the trial court's exclusion of the evidence. The court explained:

8

> [T]he evidence that the victim was arrested for soliciting an act of prostitution from an undercover officer in San Francisco at night was not particularly probative of whether the victim had solicited defendant for an act of prostitution and, rather than raping her, defendant had consensual sex. Although defendant theorizes that the way in which the victim and the defendant met "suggested prostitution was involved," we do not draw this conclusion from the evidence. The victim testified that she met the defendant when he stopped his car to talk to her and she gave him her phone number because she thought he was cute. They met during the day at defendant's instigation, while the victim was walking from work to the BART station. The victim testified that this was not an uncommon way for people to meet each other in the neighborhood. This encounter does not suggest that the victim was soliciting the defendant for an act of prostitution similar to that with which she had been charged in 1997. Defendant also suggests that the victim's willingness to accept his offer of a ride home the night he raped her and her frank warning to him that she was not interested in having sex with him must be read as the behavior of a woman soliciting an act of prostitution. We do not agree. If anything, the victim made clear that she was not interested in having sex with defendant, hardly the action of someone soliciting prostitution. Finally, defendant argued that because the DNA analysis of the victim's underwear found semen from three different men, including defendant, the victim was a prostitute. We will not assume, as defendant seems to urge us to, that a sexually active woman must be assumed to be acting as a prostitute.
>
> In fact, the evidence was quite to the contrary. The victim's injuries were consistent with forced, nonconsensual intercourse. The victim's testimony that she wrote the words "help me" in the fogged glass of the car's window was corroborated by the police inspection of defendant's car. (Defendant's suggestion that this behavior is a common ruse used by prostitutes is completely unsupported and we reject it.) The victim cooperated with the police in making pretext calls to defendant. During these calls, defendant frequently changed the subject, behavior that could reasonably be attributed to a consciousness of guilt.  In light of the minimally probative value

9

> of the evidence of the victim's 1997 prostitution arrest, we agree with the trial court that evidence of the prior arrest for prostitution was more prejudicial than probative because it would cause the jury to speculate that, if the victim had been arrested for prostitution, she might have consented to sex with defendant.

People v Ernest, 2005 Cal App Unpub LEXIS 454, at ** 12-14.

Generally speaking, the exclusion of evidence that is "highly relevant" to a defense contravenes due process. See Green v Georgia, 442 US 95, 97 (1979) (finding a due process violation when testimony excluded at trial "was highly relevant to a critical issue in the punishment phase of the trial" regardless of the state's hearsay rule); Chambers v Mississippi, 482 US 284, 302-03 (1973) (holding that exclusion of third-party testimony that was "critical evidence" violated due process). In deciding whether the exclusion of evidence violates due process, a court balances the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Chia v Cambra, 360 F3d 997, 1004 (9th Cir 2004); Drayden v White, 232 F3d 704, 711 (9th Cir 2000). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. See Chia, 360 F3d at 1006.

Even if the exclusion of evidence amounts to a violation of due process, habeas relief may be granted only if the error had a substantial and injurious effect on the verdict. See Brecht v Abrahamson, 507 US 619, 637 (1993). In other words, the error must have resulted in "actual prejudice." Id.

10

The California court of appeal's rejection of petitioner's claim that the trial court violated his due process rights when it excluded evidence of the victim's arrest was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or was based on an unreasonable determination of the facts.  See 28 USC § 2254(d).

The victim's arrest for prostitution three years before the rape was not very probative whether she was engaged in prostitution the night she met petitioner.  Nothing about the circumstances of the meeting between petitioner and the victim suggested prostitution was involved.  Instead, the evidence indicates that the victim made it very clear that she did not want to have sex with petitioner.  Nor was petitioner's encounter with the victim factually similar to the facts of the earlier arrest.  Given the potentially prejudicial nature of the evidence, the trial court was within its discretion to exclude this evidence as not particularly probative.

The excluded evidence was not particularly reliable either.  While it was clear that the victim had been arrested, she was never charged with or convicted of any crime in relation to the incident.  The implication that the victim was a prostitute is not a reliable assumption based on this evidence, nor is the evidence a reliable indication of her credibility.

Because the excluded evidence was not particularly probative or reliable, its exclusion by the trial court did not violate petitioner's right to due process.  See Chia, 360 F3d at 1004.  Petitioner's claim that the victim was a prostitute may have been a major part of his defense, and the evidence of the arrest may

11

have been his only evidence of that theory. Nonetheless, those factors alone did not give petitioner a constitutional right to introduce the evidence. The evidence's low probative value, high potential for prejudice and unreliable nature all outweigh the petitioner's interest in presenting it. See id. After all, the facts presented at trial did not support a prostitution defense. The victim was working at Walgreen's at the time of the rape. She called the police as soon as she got home and cooperated with investigators by placing pretext phone calls to petitioner. She underwent an invasive medical examination, which found signs of vaginal tearing consistent with rape and even wrote the words "help me" in the fogged glass of petitioner's car.

Even if the trial court's exclusion of the evidence had amounted to constitutional error, petitioner would not be entitled to federal habeas relief because it cannot be said that the alleged error had a substantial and injurious effect on the jury's verdict. See <u>Brecht</u>, 507 US at 637. The excluded evidence would have had little impact on the jury in light of the lack of evidence supporting a prostitution defense and the wealth of evidence showing that petitioner raped the victim.

Petitioner is not entitled to federal habeas relief on his exclusion of evidence claim. The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts. See 28 USC § 2254(d).

**12**

**B**

Petitioner claims that the trial court violated his due process rights when it excluded evidence that the victim was fired from her job at Walgreen's. The victim testified at the preliminary hearing that she had recently been fired from her job for giving her friends "free things." Petitioner claims that this incident is relevant evidence because stealing is a crime of moral turpitude and it undermines the victim's credibility. The trial court granted the prosecution's motion to exclude evidence because it was more prejudicial than probative and would lead to an undue consumption of time.

The California court of appeal found no abuse of discretion in the trial court's exclusion of the evidence related to this incident. The court explained:

> Given that exploring the reasons for the victim's termination would involve testimony of a variety of people, including former coworkers and supervisors as well as her friends, the trial court was within its discretion to conclude that the time expended in delving into this area, when weighed against the probative value of the evidence, justified excluding the evidence.
>
> Nor did this ruling violate defendant's rights of confrontation and due process under the federal Constitution * * * Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." (People v. Carpenter (1999) 21 Cal.4th 1016, 1051.)  The trial court's ruling fell within that area of discretion.

People v Ernest, 2005 Cal App Unpub LEXIS 454, at ** 22-24.

The California court of appeal's rejection of petitioner's claim that the trial court violated his due process rights when it excluded evidence of the victim's termination from her job was not

13

contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 USC § 2254(d).

     The incident was not probative of the truthfulness of the victim's account of the rape. If the victim had in fact been giving things at the store away to her friends, her conduct may have only qualified as a misdemeanor, which does not indicate dishonesty as strongly as a felony. The evidence was not reliable either. The victim was never charged with a crime, and the facts of the situation may have been difficult to prove. Furthermore, the victim may have been fired for a combination of reasons. Determining what actually happened would have been time-consuming and perhaps not even possible. In light of the totality of the circumstances, the trial court's exclusion of evidence of the victim's termination from Walgreen's cannot be said to have amounted to a violation of petitioner's due process rights. See Chia, 360 F3d at 1004.

     Even if the exclusion of the evidence of the victim's termination had amounted to constitutional error, petitioner would not be entitled to federal habeas relief because it cannot be said that the alleged error had a substantial and injurious effect on the jury's verdict. See Brecht, 507 US at 637. The evidence would have had little impact on the jury in light of the substantial evidence presented at trial that petitioner was guilty of rape.

     Petitioner is not entitled to federal habeas relief on his exclusion of evidence claim. The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be

**14**

based on an unreasonable determination of the facts.  See 28 USC § 2254(d).

C

Petitioner claims that the trial court findings on his prior convictions should be reversed because he was absent from the proceedings and was entitled to a jury trial on those issues.

Petitioner was out of custody during the trial and did not return to court when the jury announced its verdict.  The following day the court held a court trial on his prior convictions, having determined that petitioner was voluntarily absent from the proceedings and had previously waived a jury trial on his priors.  The court found that defendant had suffered two prior "strike" convictions, two prior serious felony convictions, and one prior prison term.  Petitioner claims that he did not waive his right to a jury trial on the issue of his prior convictions and that, because the court found more than the simple fact of his prior convictions, he was entitled to a jury trial on those issues.

The California court of appeal found no abuse of discretion in the trial court's decision to proceed with the court trial on the prior convictions in petitioner's absence.  The court found that petitioner's right to a jury trial on factual issues relating to prior convictions is only a statutory right, and if the court made an error in proceeding with a court trial on those issues it was harmless error.  People v Ernest, 2005 Cal App Unpub LEXIS 454, at *27-28.  The court added that, contrary to petitioner's claim, Apprendi v New Jersey, 530 US 466 (2000), does not give petitioner a constitutional right to a jury trial on all of the allegations underlying the sentencing enhancement.  Id at *29.  The

15

court explained that recidivism findings that are unrelated to the elements of a crime can be used to enhance a sentence without full due process treatment. Id.

The court of appeal also found that the trial court did not err by proceeding in petitioner's absence. The court explained:

> [W]hen a defendant is absent from trial proceedings after a trial has begun, the court may proceed with the case so long as it finds that the defendant's absence is voluntary and the case does not involve the death penalty. It is undisputed that defendant voluntarily absented himself from the proceedings. The trial was bifurcated and, therefore, reached its conclusion when the charged priors were proven, not when the jury rendered its verdicts. (People v. Givan (1992) 4 Cal.App.4th 1107, 1114-1115 [prior conviction trial constitutes phase of larger proceeding in bifurcated trial].) The trial court, therefore, did not err in proceeding to a bench trial of defendant's prior convictions.

Id. at 30.

The California court of appeal's rejection of petitioner's claim – that the trial court's findings on his prior convictions should be reversed because he was absent from the proceeding and was entitled to a jury trial on those issues – was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 USC § 2254(d).

Every criminal defendant has "the right to personal presence at all critical stages of the trial." Rushen v Spain, 464 US 114, 117 (1983). A defendant can waive the right to personal presence, however, provided he does so voluntarily, knowingly and intelligently. Campbell v Wood, 18 F3d 662, 671 (9th Cir 1994) (en banc). Such a waiver need not be express; it may be implied by a

16

showing that the defendant "knowingly and voluntarily fail[ed] to appear for trial." United States v Houtchens, 926 F2d 824, 827 (9th Cir 1991).

Here, the trial court here found that petitioner was voluntarily absent from the proceedings. Reporter's Transcript ("RT") at 538. This finding must be presumed correct unless petitioner rebuts the presumption by clear and convincing evidence. 28 USC § 2254(e)(1); Brewer v Raines, 670 F2d 117, 120 (9th Cir 1982). Petitioner does not. He has submitted no evidence whatsoever that his absence was involuntary. The court must presume that petitioner was voluntarily absent from the proceedings and effectively waived his right to be present during the court trial on the issue of his prior convictions. See id.

Petitioner's claim fails even if he had not waived his right to personal presence. The right to be present at all critical stages, like most constitutional rights, is subject to harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'" Campbell v Rice, 408 F3d 1166, 1172 (9th Cir 2005) (en banc) (quoting Rushden v Spain, 464 US 114, 117 n2 (1983) (per curiam)). Here, it is unlikely that the court would have reached a result more favorable to the petitioner had he been present during the court trial on his prior convictions. Any error in proceeding without petitioner present was harmless. Id.

Petitioner claims that, while he may have waived his right to be present at the trial on his priors, he had a right to have a jury decide the factual issues of his prior convictions. Petitioner argues that because he did not personally waive that right, the findings of the trial court must be reversed.

17

The record shows that the day after the jury read the verdicts, the court proceeded with a bifurcated court trial on the issue of the prior convictions. Doc #32, Ex B, RT at 534-560. After reviewing the evidence, the court announced its findings: "The court finds that the first prior conviction in fact occurred and that is true, and the second prior conviction is true, and the third prior conviction is true. And that for all of these [reasons] Mr. Ernest served a prison term therefore [sic]." Id at 559. The court then set a date for sentencing and concluded the matter. Id at 559, 560.

Petitioner argues that the trial court found more that the existence of the prior convictions permitted by Apprendi and Blakely v Washington, 542 US 296 (2004). Specifically, petitioner contends that the jury should have determined whether the prior convictions counted as "strikes" for the purposes of California Penal Code § 667, and that the jury should have decided the factual issue of his prior prison term. Petitioner is not entitled to habeas relief on this claim because the findings of the trial court were within the prior conviction exception described in Apprendi.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 US at 488-90. Prior convictions and recidivist behavior increasing the maximum penalty need not be presented to the jury because they are not considered an element of the offense charged. See Almendarez-Torres v United States, 523 US 224, 243-44 (1998); United States v Pacheco-Zepeda, 234 F3d 411, 414-15 (9th Cir 2001) (holding that Almendarez-Torres remains good

18

law after <u>Apprendi</u> and provides that prior convictions, whether or not admitted by the defendant on the record, are sentencing factors rather than elements of the crime).

Here, the findings of the trial court related only to petitioner's prior convictions. Where a sentence enhancement is based on a defendant's prior convictions, the calculation of his sentence falls within the <u>Almendarez-Torres</u> exception to <u>Apprendi</u>. See id; see also <u>United States v Quintana-Quintana</u>, 383 F3d 1052, 1053 (9th Cir 2004) (<u>Almendarez-Torres</u> exception not altered by <u>Blakely</u>). <u>Apprendi</u> generally applies to uncharged aspects of the underlying conviction that were not reflected in the jury's verdict, such as amount of drugs involved or personal use of a weapon. Determinations about prior convictions, including whether a prior conviction carried a prison term or counts as a "strike," are sentencing factors that fall within the <u>Almendarez-Torres</u> exception to <u>Apprendi</u>. See id; <u>Pacheco-Zepeda</u>, 234 F3d at 414-15. Petitioner was not entitled to a jury trial on the prior conviction determination. The state court's rejection of his claim certainly was not an objectively unreasonable application of Supreme Court precedent. See 28 USC § 2254(d).

Petitioner's claim fails even if he was entitled to a jury trial on the prior conviction determination. The failure to submit a sentencing factor to the jury, like the failure to submit an element to the jury, is subject to harmless-error analysis. <u>Washington v Recuenco</u>, 126 S Ct 2546, 2553 (2006). Here, there is no indication that the jury would have reached a result more favorable to petitioner had they determined the facts of the prior

convictions rather than the court.  Any error in having a court trial on the issue was harmless.  Id.

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

**VAUGHN R WALKER**
**United States District Chief Judge**